**AFFIRM; and Opinion Filed August 5, 2013.**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

_____

**No. 05-12-01217-CR**

_____

**FREDDIE EARL FINLEY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 282nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F12-50807-S**

## MEMORANDUM OPINION

Before Justices Moseley, Bridges, and Lang-Miers
Opinion by Justice Lang-Miers

Appellant Freddie Earl Finley was charged with possession of cocaine with intent to deliver. The trial court denied his pretrial motion to suppress and a jury convicted him of the offense. Appellant then signed a judicial confession and stipulation of evidence. Pursuant to a plea agreement, the trial court assessed his punishment at ten years in prison. On appeal, appellant argues that the trial court erred when it denied his motion to suppress because the police did not have reasonable suspicion to detain him. We affirm.

## BACKGROUND

Appellant and two witnesses for the State testified.[1] Appellant testified that, early in the morning on January 4, 2012, he left his apartment—Apartment A210 at 9302 Forest Lane—to go to a neighbor's house to get some cigarettes that the neighbor was supposed to get for him at a store. Appellant testified that three to six police officers approached him as he was on his way back from his friend's house. According to appellant, the police "were shining flashlights and said, 'Dallas police. Stop,' something to that effect." But appellant admitted, "It's been months ago. All I remember is they stopped me."

Appellant testified that, when the police "stopped" him, he did not feel like he could continue walking and that the police "approached and grabbed [him] by the arm." When asked "[o]nce they grabbed you by the arm, did they have any conversation with you or what happened next[,]" appellant testified "it's been so long ago I don't remember." But then he testified: "They asked me where I was going, if I'm not mistaken. I told them, 'Going to my unit, going home.'" Appellant also testified that, while he and the police conversed, the police "still physically [had] a hand on" him.

Appellant testified that "almost simultaneously" the officer asked him what was in his pocket and the officer "was going in" appellant's pocket "at the same time" while he held appellant by the arm. Appellant testified that he was "fixing to give him [appellant's] keys" and "empty [his] pockets" when the officer began "going in himself." Appellant testified that the officers did not "just pat down on the outside" but went "in [his] pockets" and in the pair of shorts that appellant had on under his pants. Appellant testified that "at no point did [he] give

[1] Appellant testified outside of the presence of the jury for the limited purpose of testifying concerning the motion to suppress. Officer Steven Ulas and Officer Steven Martin of the Dallas Police Department testified in the presence of the jury. Appellant also testified before the jury after the judge's ruling on the motion to suppress, but this later testimony by appellant is not relevant here. *See O'Hara v. State*, 27 S.W.3d 548, 551 (Tex. Crim. App. 2000). Separately, two additional witnesses testified prior to the trial court's ruling on the motion but their testimony is not relevant to this appeal.

him permission to search" and that "[a]t no point did [he] feel as though [he was] free to leave" once the police approached him. Appellant also testified that before the police had "any conversation" with him or knew who he was, the officers had "physically put their hands on [him] and detained" him.

The State asked him, on cross-examination, whether he had cigarettes in his possession and if his friend wondered why he would come to get cigarettes at 2:30 in the morning. He testified that he did not get cigarettes from his friend because his friend was not back from the store when he went to his apartment. And he testified that it was "nothing new" for him and others who live in his apartment complex to "be up all night playing dominoes or cards" because the complex "is for disabled people" and many "don't work at all." He also testified that, when the police approached him, he was on the walkway on the back side of his apartment and that the area where they stopped him was lit by a gas light. Appellant testified that the officers "said they had a phone call [that] said somebody was in front of A210 selling, making drug transactions" and appellant's response was that "it couldn't have been [him] because [he] wasn't in front of A210."

Appellant testified that he was "wearing black pants and a black top that night" and that it was "kind of cold[.]" Appellant also testified that, before they found the cocaine, one officer "was inside [his] pockets, inside [his] shorts[,]" one held his arm,[2] and one grabbed his cell phone. According to appellant, the officer did not ask if "he could search [appellant's] person" and appellant did not get a chance to tell the officer that he could not search appellant because

---

[2] Appellant testified that "three or four" officers held his arm, but later testified that one officer held his arm.

the officer "was in [appellant's] pocket before." Appellant admitted on cross-examination that he "had the crack on" him, but denied selling cocaine.[3]

Officer Steven Ulas testified that on the morning of January 4, 2012, he was working with a crime response team and answered a call that came in at 2:20 in the morning to Apartment A210 at 9302 Forest Lane. The caller stated that a "black male wearing dark clothing [was] selling drugs from in front of the Apartment Number A210." Ulas also testified that the caller said the suspect was selling crack and that while the caller "was speaking to the 911 operator, he had seen a drug transaction transpire[.]" Ulas testified that he had previously been to that apartment complex several times because he had investigated two prior drug sale complaints in the complex, although not at that specific apartment. According to Ulas, the apartment complex was "known for criminal activity" and the area was a "[h]igh-crime area, specifically violent crime, drug activity, property crimes." Officer Ulas testified that he and his partner, Officer Steven Martin, "located where the building was and immediately saw a black male wearing all dark clothing walking in front of the building" who "fit the description of what the 911 caller gave[.]" Ulas testified that the person "was walking towards that building" and "was the only person out there" and that he was "[a]bout directly in front of" Apartment A210 and "right in front of the stairs that lead up to" Apartment A210. Ulas testified that two other police officers arrived ten to twenty seconds after he and Martin did.

Ulas testified that the officers "approached him calmly" and "[t]ried to make a casual stop with him." Ulas testified that he engaged appellant "in conversation or ask[ed] questions" and that he "might have asked him what he was up to." Ulas also testified that he believed that he "informed him someone called the police on him" and that, in response, appellant "said he

---

[3] Appellant testified that the cocaine was in a pocket of his shorts.

–4–

lived there." Ulas testified that appellant "was visibly nervous" and "[v]ery defensive" while the officers talked to him and that he "was not comfortable with [the officers] being there." Ulas testified that appellant "kept looking around" and, based on Ulas and Martin's experience, "that's an indicator somebody's about to run away or do something." Ulas testified that the officers could see when they used their flashlights that appellant had "kind of [a] deer-in-the-headlights look" and "[y]ou could see his eyes back and forth" and the officers "were afraid this person might run[.]" In addition, Ulas testified that it was "about pitch-black[,]" that the situation was "one where you're on alert or high alert, or one that could turn dangerous pretty quickly[,]" and that weapons and violence often accompany crack dealing.

According to Ulas, he then "went to do a Terry frisk to check for weapons" on appellant, which officers perform on "people suspected of engaging in criminal activity" to protect officer safety. Ulas testified:

> I informed the defendant I was gonna pat him down for weapons. I started to place my hands around his waistband, the first place we check. As soon as I did that, his right hand went really quick onto his right pocket. I had to take—physically take his hand away. I didn't search his pockets yet. I said, "Keep your hands out of your pockets."

> I finished searching his upper waist area. Went to search the lower pockets and again he takes his hand, starts reaching down there again.

> I said, "Hey, stop that. Don't reach in your pockets." I felt inside his front right watch pocket. I felt a plastic bag and various rocks of various textures, which I knew to be crack cocaine based on the texture and the totality of the circumstances.

> As soon as I had my hands down there, he reached again. I had to say, "Take your hands away," and I retrieved the bag from his right front watch pocket.

> . . . .

> . . . I made numerous drug arrests where individuals had drugs in plastic bags in a front right watch pocket.

. . . .

. . . And the call was about drug dealing. A drug dealer wouldn't have one or two crack rocks; they would have multiple for sale. Totality of the circumstances, he was directly in front of where the caller said he would be. He matched the description. The caller said he was dealing crack.

Ulas testified that appellant quickly moved toward his pocket "at least three times" and that, when appellant made those sudden movements before Ulas completed the "Terry frisk," Ulas was concerned that appellant could have a weapon, could have run or fought the officers, or could have destroyed evidence. While Ulas frisked appellant, appellant repeated "the same thing several times" including that he lived there and expletives concerning how the officers were dealing with him and appellant "was very defensive."

Ulas also testified that the police did not try to contact the reporting caller because the caller did not want to be contacted, but that it was not unusual for a caller to want to remain anonymous particularly in a case involving drug dealing because they "don't want to be labeled a snitch" and "fear retaliation."

On cross-examination, Officer Ulas testified that (1) the police had "no information as to the reliability" or the identity of the caller, (2) numerous black males in Dallas County fit the description of wearing black clothing, (3) Ulas did not see appellant doing anything illegal before Ulas came into contact with him nor did he have information that appellant had a weapon, and (4) Ulas detained appellant. On redirect examination, Ulas testified that his "experience led [him] to reasonably conclude that criminal activity might be afoot" and that he "initially" was concerned that he was dealing with somebody who was armed and presently dangerous because "[i]t's not uncommon for a drug dealer to carry weapons" and appellant's "nervous behavior put [Ulas] at higher guard."

Officer Martin testified that he and Officer Ulas received a call that "a black male in dark clothes was . . . selling crack, in front of 9302 Forest Lane[.]" Martin believed that the caller was "still on the line and the call updated right before" the officers arrived and the caller reported that the caller "was watching him perform a drug transaction out in front of the apartment." Martin testified that it took "[m]aybe a minute or two" for him and Ulas to arrive and that, "as soon as" they pulled up to the complex, they saw the building number and "saw the suspect wearing— matched the clothing description, walking towards the building" and "toward the staircase to go up to the apartment[.]" Martin also testified that no one "else [was] out there other than Mr. Finley[.]"

Martin testified, "We approached behind, and asked him to come over to us, and we walked up—we were walking up on him and told him to come here, we were gonna question him." Martin testified that appellant's response was "very defensive[,]" that he asked why the officers were messing with him, using expletives, and that appellant stated that he lived there. According to Martin, appellant did not want to answer questions or give an explanation and "would answer a question with a question"—which, in Martin's experience, "means they're nervous, not telling you the truth." Martin also testified that appellant "wouldn't look us in the eye" and was "[l]ooking side to side, looking for an out, fixing to run." According to Martin, the situation was dangerous because it was "a drug call" and a "lot of times weapons come along with drugs"; the apartment complex was in a high crime area; and it was dark and "2:00-something in the morning." Martin testified:

> My partner walked up. Usually what you do, you perform a Terry frisk. If you have reasonable suspicion to believe they're involved in a crime, which we did.
>
> So my partner went to do a Terry frisk. I believe he walked up to him. "Can I check your pockets?" He said no. "I'm gonna pat you down." When he

went to pat him, he reached for his right pocket, and my partner pushed his hands away. We don't know if he has a gun or knife.

He went to pat down again. I believe he reached for his pocket again. He pushed it up again. He said, "Quit reaching for your pockets." At that time he felt what he believed to be a Baggie in the top pocket. He could feel some rocks. He pulled it out. It was crack cocaine.

Martin testified that it was dangerous when appellant reached for his pocket because the officers did not know appellant or what appellant had in his pocket, and it "could be anything from a screwdriver or razor blade to a needle[.]" Martin testified that weapons are not all "immediately apparent like a large knife or gun[.]"

On cross-examination, Martin testified that the officers detained appellant without his consent. Martin also testified that he and Officer Ulas did not observe appellant "do anything illegal"; they had "no idea about the credibility of the information [they] received" from the caller; and the officers did not find a weapon or "any money to evidence the selling of drugs[.]"[4]

On redirect examination, Martin testified that he found the caller to be credible in describing what the officers found when they arrived at the scene. He also testified that the "totality of the circumstances" led him to "reasonably conclude, in light of [his] experience, that criminal activity was afoot" because the suspect's description matched the call sheet "[p]erfectly" and "[i]t all matched up." He also testified that his experience led him to conclude that the person he was "dealing with may be armed and presently dangerous" because often, when their unit makes a drug arrest, they "find drugs and weapons." Martin testified that appellant's conduct "didn't relax the situation" because his "demeanor was very defensive" and "very resistant" and gave "telltale signs of someone fixing to run or fight." Martin testified that the officers "did a Terry frisk" for the protection of the officers.

---

[4] Ulas also testified that the officers did not take any money into custody.

**STANDARD OF REVIEW AND APPLICABLE LAW**

When we review a trial court's denial of a motion to suppress, we apply a bifurcated standard of review: we review the trial court's factual findings for an abuse of discretion but review the trial court's application of law to the facts de novo. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). When the trial court does not issue findings of fact, as in this case, we imply findings that support the trial court's ruling if the evidence, viewed in a light most favorable to the ruling, supports those findings. *Id.* We give almost total deference to the trial court's implied findings, especially those based on an evaluation of witness credibility and demeanor. *Id.* We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Id.* We review the record as it existed at the time of the trial court's ruling on the motion to suppress. *O'Hara*, 27 S.W.3d at 551; *Hoyos v. State*, 982 S.W.2d 419, 422 (Tex. Crim. App. 1998).

There are three distinct types of interactions between citizens and police: "(1) consensual encounters, which require no objective justification; (2) investigatory detentions, which require reasonable suspicion; and (3) arrests, which require probable cause." *State v. Castleberry*, 332 S.W.3d 460, 466 (Tex. Crim. App. 2011) (footnotes omitted). Consensual encounters do not implicate the Fourth Amendment to the United States Constitution and its protections. *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Castleberry*, 332 S.W.3d at 466; *see* U.S. CONST. amend. IV (protecting against unreasonable searches and seizures). An officer is as free as anyone to stop and question a citizen and to request information and identification. *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cnty.*, 542 U.S. 177, 185 (2004); *Bostick*, 501 U.S. at 434; *Castleberry*, 332 S.W.3d at 466. And a citizen is free to terminate a consensual encounter at will. *Castleberry*, 332 S.W.3d at 466. Even if the officer does not tell the citizen that he can ignore

–9–

the request for identification or information, the fact that the citizen complies with the request does not negate the consensual nature of their encounter. *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984); *Castleberry*, 332 S.W.3d at 466.

When an officer, through a showing of authority or physical force, has restrained a citizen's liberty, the encounter is no longer consensual but is considered an investigatory detention or arrest, which are both Fourth Amendment seizures. *Brendlin v. California*, 551 U.S. 249, 254 (2007); *Castleberry*, 332 S.W.3d at 466. No bright line rule dictates when a consensual encounter becomes a seizure. *Castleberry*, 332 S.W.3d at 466–67. Rather, we must—"from a common, objective perspective"—consider the totality of the circumstances surrounding the interaction to determine whether a reasonable person would have felt free to ignore the officer's request and terminate the encounter. *Castleberry*, 332 S.W.3d at 467 (quoting *State v. Garcia-Cantu*, 253 S.W.3d 236, 244 (Tex. Crim. App. 2008)). If so, then no Fourth Amendment seizure occurred. *Brendlin*, 551 U.S. at 255; *Castleberry*, 332 S.W.3d at 467. Although we must take into account the place, time, and surrounding circumstances, the most important factor in determining whether the interaction between an officer and a citizen is a consensual encounter or a Fourth Amendment seizure is the officer's conduct. *Castleberry*, 332 S.W.3d at 467.

An officer may conduct a brief investigative detention—or a *Terry* stop—when the officer has reasonable suspicion that the person is involved in criminal activity. *See Arizona v. Johnson*, 555 U.S. 323, 326 (2009); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). "A valid investigative detention can confer upon an officer the authority to pat down the suspect for weapons." *Baldwin v. State*, 278 S.W.3d 367, 371 (Tex. Crim. App. 2009). The officer may conduct a limited search of a suspect's outer clothing for weapons if the officer reasonably

–10–

believes the suspect is armed and dangerous. *Johnson*, 555 U.S. at 326; *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *Carmouche v. State*, 10 S.W.3d 323, 329 (Tex. Crim. App. 2000).

An officer has "reasonable suspicion to detain a person if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity." *State v. Elias*, 339 S.W.3d 667, 674 (Tex. Crim. App. 2011). This standard is objective. *Id.* The determination of whether an officer has reasonable suspicion is factual, and is examined based on the totality of the circumstances. *Loesch v. State*, 958 S.W.2d 830, 832 (Tex. Crim. App. 1997). We look at the facts available to the officer at the time of the detention to determine whether reasonable suspicion existed. *Crain v. State*, 315 S.W.3d 43, 52–53 (Tex. Crim. App. 2010).

## ANALYSIS

### Arguments of the Parties

Appellant argues that the trial court should have granted appellant's motion to suppress any evidence obtained as a result of appellant's detention because the police did not have reasonable suspicion to detain him. Relying on *Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011), appellant argues that the anonymous phone call, "standing alone, was insufficient to establish reasonable suspicion to detain Appellant" because "the caller gave no personal information." He argues that the police officers "needed corroboration of the tip" or "additional facts" to have reasonable suspicion before they detained him.

Appellant also argues that the facts known by the officers—that it was nighttime and that the apartments were in a high crime area—were not sufficient to establish reasonable suspicion. Appellant quotes *Crain*, 315 S.W.3d at 53, for the proposition that "[n]either time of day nor

–11–

level of criminal activity in an area are suspicious in and of themselves[.]"  And appellant argues that facts must exist showing that the detained individual was involved in criminal activity, and, here, the officers acknowledged that appellant did not appear to be breaking the law in their presence or to have a weapon that they could see.  In addition, appellant argues that any actions by appellant that would give rise to reasonable suspicion occurred after detention began and, as a result, those actions are irrelevant to determining if there was reasonable suspicion at the inception of the detention.  Appellant argues that the officers "immediately stopped and frisked the first black man in black clothing they came upon" and that appellant's "nervousness and reaching did not come in until after they stopped, questioned, and started searching him."

The State argues that an "objective review of the evidence" establishes that the "officers' conduct was justified under *Terry v. Ohio* and its progeny."  The State contends that, when the officers arrived at the apartment complex and approached appellant, "the officers conducted either a consensual encounter or a *Terry* detention."  The State argues that the officers "calmly approached appellant to make" a "consensual stop[,]" and they asked appellant to come to them so that they could question him, told him about the phone call reporting drug dealing, and asked what he was doing, to which appellant responded that he lived there.  The State also argues that, because appellant got "very defensive and was visibly nervous" as they questioned him, and—based on their experience—was about to injure himself or the officers or flee, "the officers were reasonably concerned that appellant was armed and dangerous" and justified in conducting a pat down frisk for weapons under *Terry*.  In addition, the State argues that, when the officers first approached appellant, because the 911 caller had witnessed a drug transaction at the exact location in front of Apartment A210 "a minute or two earlier" and because appellant matched the caller's description of a "black male wearing dark clothing," the officers were "legally justified

in detaining" appellant "pursuant to *Terry v. Ohio* to maintain the status quo, investigate further, and determine his identity."[5]

### Consensual Encounter Versus Investigatory Detention

We first must determine whether, when the officers first approached appellant, the encounter was consensual or was an investigatory detention. Considering the totality of the circumstances from a common, objective perspective, we must determine whether appellant would have felt free to terminate the encounter with the officers and ignore their request. *See Castleberry*, 332 S.W.3d at 467. In addition to considering the time, place, and surrounding circumstances, we must focus on the officers' conduct, which is a determinative factor in ascertaining whether a consensual encounter or a detention occurred. *Id.*

Appellant testified that, when the officers approached him, he did not feel like he could continue walking, and the police "grabbed [him] by the arm." Appellant also testified that, while he told the police where he was going, they "still physically [had] a hand on" him and kept holding him by the arm while an officer "almost simultaneously" asked appellant what was in his pocket and then "was going in" his pocket. Appellant also testified that "[a]t no point did [he] feel as though [he was] free to leave" after he encountered the police. In contrast, Officer Ulas testified that the officers approached appellant calmly and "[t]ried to make a casual stop with him." Ulas informed appellant that "someone called the police on him" and that, in response, appellant "said he lived there." Officer Martin similarly testified that when they first approached appellant, they asked appellant to come to them and told him that they wanted to question him. Because the trial court did not issue findings of fact, we imply findings that support its ruling if

---

[5] The State also contends that the plain feel doctrine under *Minnesota v. Dickerson*, 508 U.S. 366, 375–76, 378–79 (1993), justified Officer Ulas's reaching into appellant's pocket because Ulas—based on his training and experience—could tell that he felt a plastic bag with cocaine rocks in it inside appellant's pocket without manipulating appellant's clothing during the pat down. This issue is not before us. Appellant's arguments on appeal allege that there was a lack of reasonable suspicion to detain appellant, and do not concern whether Ulas was justified in reaching into appellant's pocket.

the evidence, viewed in a light most favorable to the ruling, supports those findings and give almost total deference to the trial court's implied findings, especially those based on credibility and demeanor. *See Turrubiate*, 399 S.W.3d at 150. "Because an officer is just as free as anyone to question, and request identification from, a fellow citizen," *Castleberry*, 332 S.W.3d at 468, we conclude that the officers' conduct reflects that the initial interaction was a consensual encounter.

We next consider the time, place, and surrounding circumstances of the interaction. Both appellant and the officers testified that appellant was standing in close proximity to his apartment when the officers approached him.[6] Appellant was alone and it was 2:20 a.m. But he testified that it was not unusual for him and others who live in his apartment complex to "be up all night playing dominoes or cards." The testimony differed as to whether the area where appellant encountered the police was well lit. Appellant testified that the area was lit by a gas lamp while Officer Ulas testified that it was "about pitch-black."

Considering the totality of the circumstances from a common, objective perspective, we conclude that a reasonable person in appellant's position would have felt free to terminate the encounter when the officers approached him and asked him questions and, as a result, the initial encounter was consensual. *See Castleberry*, 332 S.W.3d at 467–69 (concluding interaction was initially a consensual encounter where officer approached appellant and asked for identification and why he was there at 3:00 a.m., appellant was one block from his house, and the area was well lit and had foot traffic at that time of night and concluding that entire interaction between appellant and officer had "two distinct parts": a consensual encounter followed by a detention).

---

[6] Appellant testified that he was on a walkway behind his apartment, while the police officers testified that he was in front of his apartment; in either instance, he was in close proximity to his apartment.

–14–

**Reasonable Suspicion**

Although we conclude that the initial encounter between appellant and the officers was consensual, the officers subsequently detained appellant when they conducted a pat down frisk. *See Johnson*, 555 U.S. at 326, 330 (discussing constitutional requirements for investigatory stop and pat down for weapons); *Terry*, 392 U.S. at 19 (concluding that officer "seized" and "search[ed]" petitioner when "he took hold of him and patted down the outer surfaces of his clothing"). To determine whether the officers conducted a permissible investigative detention, we must determine whether the officers had a reasonable suspicion that appellant was involved in criminal activity. *See Johnson*, 555 U.S. at 326; *Ford*, 158 S.W.3d at 492. If the investigative detention was valid, the officers also had authority to pat down appellant for weapons if they reasonably believed that appellant was armed and dangerous. *Terry*, 392 U.S. at 27; *Baldwin*, 278 S.W.3d at 371.

Based on these facts, we conclude that the officers had "specific, articulable facts that, combined with rational inferences from those facts," led them to conclude that appellant was, had been, or soon would be engaged in criminal activity. *Elias*, 339 S.W.3d at 674. The officers received a report of a 911 call at 2:20 a.m. informing them that a drug transaction had just occurred in front of Apartment A210 at 9302 Forest Lane and that the suspect was a black man in dark clothes. These apartments were located in a high crime area and Officer Ulas previously had investigated two drug sale complaints in the apartment complex. When the officers arrived a minute or two later, appellant was standing in front of Apartment A210 dressed in dark clothes, and he was the only person standing in front of the building.[7] When the officers approached appellant, he was defensive, nervous, and unresponsive to their questions, and displayed

[7] Appellant testified that he was behind the building when the officers approached him and both officers testified that appellant was in front of the building.

–15–

behavior that the officers knew from experience indicated that he was about to flee or injure someone. Based on these facts, this case is distinguishable from two cases that appellant relies upon. Although in *Martinez*, 348 S.W.3d at 923, the court concluded that an anonymous tip "seldom provides reasonable suspicion for an investigative stop[,]" here, the officers were not relying solely on an anonymous tip at the time that they detained appellant, but also on additional specific, articulable facts, including appellant's behavior. *See Illinois v. Wardlow*, 528 U.S.119, 124 (2000) ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."). And although, under *Crain*, 315 S.W.3d at 53, the time of day and the level of criminal activity in an area are not suspicious "in and of themselves[,]" here, there were additional circumstances that raised suspicion that appellant was, had been, or soon would be engaged in criminal activity at the time of the detention. We conclude that the officers had reasonable suspicion to detain appellant.

We resolve appellant's sole issue against him.

### CONCLUSION

We resolve appellant's sole issue against him and affirm the trial court's judgment.


/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
Tex. R. App. P. 47

121217F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

FREDDIE EARL FINLEY, Appellant

No. 05-12-01217-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 282nd Judicial District Court, Dallas County, Texas

Trial Court Cause No. F12-50807-S.

Opinion delivered by Justice Lang-Miers, Justices Moseley and Bridges participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 5th day of August, 2013.

/Elizabeth Lang-Miers/

ELIZABETH LANG-MIERS
JUSTICE

–17–